**SIGNED THIS: October 19, 2017**

_____
**Thomas L. Perkins
United States Bankruptcy Judge**

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 7 |
| MID-ILLINI HARDWOODS, LLC, ) | Case No. 13-81354 |
| ) | |
| Debtor. ) | |
| _____ ) | |
| ) | |
| JEANA K. REINBOLD, Trustee, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Adv. No. 14-8075 |
| ) | |
| MORTON COMMUNITY BANK, ) | |
| ) | |
| Defendant. ) | |

**O P I N I O N**

This matter is before the Court on cross-motions for summary judgment on the complaint filed by Jeana K. Reinbold (the "Trustee"), against Morton Community Bank (MCB). Ms. Reinbold is serving as the Trustee in the Chapter 7 bankruptcy case filed by Mid-Illini Hardwoods, LLC (the "Debtor"). She filed suit against MCB to avoid and recover ten payments made by the Debtor to MCB between November 5, 2010, and August 12, 2011, totaling $22,100, as constructively fraudulent under the Uniform Fraudulent Transfer Act.

1

**BACKGROUND**

The basic facts are undisputed. The Debtor is owned in equal shares by Carroll and Sandra Newnam, husband and wife (together, the "Newnams" or "Carroll and Sandra"). The Debtor was formed in 2009 to operate an existing sawmill plant located in Lacon, Illinois, that was vacant after its previous owner had been foreclosed upon. For many years prior, the Newnams owned and operated a mulch business incorporated as Newnam Marketing Inc. After the Debtor was formed, Carroll continued to manage the mulch business, while Sandra devoted her time and effort to getting the sawmill business up and running and serving as its bookkeeper. The Newnams' son, Derek, was hired to manage the sawmill.

Carroll and Sandra, individually, purchased the sawmill real estate from MCB in 2009 with purchase money financing provided by MCB. They signed a note for $329,000 and granted MCB a mortgage on the property to secure the note, which called for 59 monthly payments of $2,184.73 each, commencing on June 8, 2009, and a final balloon payment of $277,098.24 on May 8, 2014. The personal property equipment needed to run the sawmill was purchased from the First National Bank of Lacon by Carroll and Sandra. The Debtor did not execute any of the loan documents and did not otherwise obligate itself to MCB or the First National Bank of Lacon.

The Newnams personally made the first five mortgage payments to MCB. After the sawmill operation got up and running in the autumn of 2010, the Debtor made the mortgage payments beginning with the payment for November 2010 and continuing through August 2011. Initially, the Debtor occupied the real estate without a written lease agreement. Eventually, the accountant retained by Sandra recommended that a written lease be prepared and that the Debtor remit the rent payment to the Newnams. Per the accountant's advice, a written month-to-month

lease was drawn up dated October 1, 2011, calling for rent of $4,500 per month. Carroll and Sandra signed the lease as Lessor. Sandra executed the lease on behalf of the Debtor as Lessee. Sandra testified in her deposition that the amount of the rent was determined based upon a $2,200 monthly mortgage payment to MCB and a $2,300 monthly equipment loan payment to First National Bank of Lacon. During the 10-month period that the Debtor paid the mortgage payments to MCB, the Debtor did not make any payment to the Newnams for rent. Beginning in September 2011, the Debtor stopped paying MCB and, instead, began making monthly payments of $4,500 to Carroll.

  Sandra prepared and signed the checks drawn on the Debtor's checking account. She testified that the ten payments the Debtor paid directly to MCB were "in lieu of rent" payments to Carroll and her. The face of those checks contained a handwritten reference to "Lacon Lease." The Trustee is seeking to avoid only those ten payments made before the written lease went into effect and before the Debtor began making a combined payment to Carroll for both the real estate and the equipment.

  The sawmill business model consisted of the Debtor purchasing timber or the rights to harvest timber, milling the rough logs into boards, and selling the boards to lumberyards and other purchasers. When the Debtor first started running the sawmill, it obtained working capital via loans from Newnam Marketing. It did not have any bank operating loans or lines of credit. By the end of 2010, Newnam Marketing had loaned the Debtor $9,500. By the end of 2011, its loans to the Debtor totaled $311,419.

  For tax year 2010, on gross sales of $41,898, the Debtor had a gross profit of $41,898 and a net loss of $3,442. For tax year 2011, on gross sales of $887,087, the Debtor had a gross profit of $434,642 and a net profit of $19,049. For tax year 2012, on gross sales of $818,700, the

Debtor had a gross profit of $230,438 and a net loss of $130,729. In January 2012, Derek suddenly quit as manager of the sawmill. Sandra ended up thereafter trying to manage the business herself until it closed in 2013. The Debtor filed its chapter 7 petition on July 5, 2013.

The Trustee's single-count complaint is brought under section 5(a)(2) of the Uniform Fraudulent Transfer Act (the "UFTA"), 740 ILCS 160/5(a)(2), which grants a debtor's creditors the power to avoid certain constructively fraudulent transfers. That avoiding power is made available to bankruptcy trustees by operation of section 544(b)(1) of the Bankruptcy Code. The primary issue is whether the Debtor received reasonably equivalent value in exchange for the payments it made to MCB. Much of the evidence submitted and arguments made by the parties pertain to the Debtor's financial condition, whether it was sufficiently capitalized and had sufficient assets to carry on its business. The Court's determination that the Debtor did receive reasonably equivalent value makes it unnecessary to address these other issues.

## ANALYSIS

### A. Jurisdiction and Authority to Issue Final Judgment

The Court has jurisdiction to hear and determine this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. Proceedings to determine, avoid, or recover fraudulent conveyances are core proceedings. 28 U.S.C. § 157(b)(2)(H).

The Supreme Court has not decided whether fraudulent conveyance avoidance claims asserted by a Chapter 7 trustee are so-called "*Stern* claims," that is, proceedings that are defined as "core" by statute but may not, as a constitutional matter, be adjudicated as such by a bankruptcy court. *Executive Benefits Ins. Agency v. Arkison,* 134 S.Ct. 2165 (2014)(interpreting *Stern v. Marshall,* 564 U.S. 462 (2011)). Even if fraudulent conveyance claims are *Stern* claims,

a bankruptcy court may nonetheless issue a final judgment "when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge." *Wellness Int'l Network, Ltd. v. Sharif,* 135 S.Ct. 1932, 1939 (2015).

Consent may be express or implied. *In re Fisher Island Investments, Inc.,* 778 F.3d 1172 (11th Cir. 2015). The Supreme Court has held that consent to try a case to final judgment before a Magistrate Judge may be implied where a party is aware of the need for consent and the right to refuse it, and still voluntarily litigates the case without expressing a refusal. *Roell v. Withrow,* 538 U.S. 580, 590 (2003). Consent may be implied where a party extensively participates in litigation without raising any challenge to the bankruptcy court's authority. *In re Pringle,* 495 B.R. 447, 456-62 (9th Cir. BAP 2013).

Although in its answer to the complaint, MCB refused to consent to the Court's authority to issue a final judgment, it subsequently changed its position. In its response to the Trustee's motion for summary judgment, MCB expressly consents to the entry of a final judgment by this Court.

The Trustee, while asserting the "core" status of this proceeding, has not expressly consented to the Court's authority in the event of a "*Stern* claim" determination. At the time that the complaint was filed, Fed.R.Bankr.P. 7008 did not require a plaintiff to state in the complaint whether she was or was not consenting to the entry of final orders or judgment by the bankruptcy court. Throughout the pleadings and briefs filed in this proceeding, the Trustee has remained silent on the issue of this Court's authority to issue a final judgment on a *Stern* claim.

It is not settled whether a bankruptcy trustee who files an adversary complaint in bankruptcy court in the exercise of her chapter 5 avoiding powers has the right to refuse to consent to the court's authority. While Article III, § 1, of the Constitution serves to protect a

5

litigant's personal right to have claims decided by judges "who are free from potential domination by other branches of government, … Article III does not confer on litigants an absolute right to the plenary consideration of every nature of claim by an Article III court." *Commodity Futures Trading Com'n v. Schor,* 478 U.S. 833, 848 (1986). The Supreme Court in *Wellness,* determining that a litigant's right to an adjudication by an Article III court is a personal right that may be waived, recognized that "the cases in which this Court has found a violation of a litigant's right to an Article III decisionmaker have involved an objecting defendant forced to litigate involuntarily before a non-Article III court." 135 S.Ct. at 1947. The Trustee, a plaintiff who derives her standing solely from the bankruptcy case and who filed her complaint in the exercise of powers granted under the Bankruptcy Code, is certainly not a defendant who is being forced involuntarily to litigate before a non-Article III judge.

It is not necessary for this Court to decide this unresolved question today, since the Trustee's conduct in this litigation constitutes an implied waiver of her right, if she has such a right, not to consent to this Court's authority to issue a final judgment in this proceeding. See *Roell* and *Pringle, supra.* With MCB's express consent, this Court has the authority to enter a final judgment.

**B. Summary Judgment Standards**

Summary judgment should be granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c)(2). When cross-motions for summary judgment are at issue, each motion must be assessed independently; denial of one does not necessitate grant of the other. *Lexion Medical, LLC v. Northgate Technologies, Inc.,* 618 F.Supp.2d 896, 899 (N.D. Ill. 2009). The court must consider the evidence through separate lenses, always allowing the non-moving party the benefit of all

6

conflicts in the evidence and choices among reasonable inferences from the evidence. *Rhino Linings USA, Inc. v. Harriman,* 658 F.Supp.2d 892, 896 (S.D. Ind. 2009).

The moving party must show there is no genuine issue of material fact and meets this burden by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party meets its burden, the nonmoving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A disputed fact is material only if its resolution affects the outcome. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Disputes over facts that are irrelevant or unnecessary do not count. *Fritcher v. Health Care Serv. Corp.,* 301 F.3d 811, 815 (7th Cir. 2002). Ultimately, the court must determine whether there is a need for trial, i.e., whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. *Anderson,* 106 S.Ct. at 2511; *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir. 1995).

### C. Fraudulent Transfer Standards

To avoid a transfer under a theory of constructive fraud under section 5(a)(2) of the UFTA, a plaintiff must prove (1) that the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer, and (2) either one of the following: (a) that the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (b) that the debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due. If it is established that the debtor received reasonably equivalent value in exchange for the transfer, the inquiry ends and

7

judgment must enter for the defendant. When determining whether reasonably equivalent value was received under the UFTA, courts consider how the phrase has been construed under section 548 of the Bankruptcy Code. *Creditor's Committee of Jumer's Castle Lodge, Inc. v. Jumer,* 472 F.3d 943 (7th Cir. 2007).

Where a debtor's transfer of money or property is sought to be avoided, determining receipt of reasonably equivalent value involves a three-part inquiry: (1) the court must determine that a debtor received some value; (2) the value received must have been *in exchange for* a transfer made by the debtor; and (3) the value of what was received by the debtor must have at least a reasonable equivalence to the value of what the debtor transferred. Value is given for a transfer if in exchange for the transfer, property is transferred or an antecedent debt is secured or satisfied. 740 ILCS 160/4(a). "Reasonable equivalence" requires a comparison of the value of what went out with the value of what was received, based upon fair market value at the time of the transfer. *In re Grabill Corp.,* 121 B.R. 983, 994 (Bankr. N.D. Ill. 1990). Under the UFTA, it is necessary neither that the value received by the debtor be money nor that the consideration transferred was pursuant to a valid contract. *For Your Ease Only, Inc. v. Calgon Carbon Corp.,* 560 F.3d 717, 722 (7th Cir. 2009).

**D. Reasonably Equivalent Value Analysis**

Sandra testified at her deposition that the Debtor's direct payments to MCB were "in lieu of rent." She testified that the Debtor could have paid Carroll and her and they could have then paid MCB, but "in my mind at that time it made sense that Mid-Illini was using the property and Mid-Illini paid the rent until my accountant told me to do it differently." She was not cross-examined about this testimony. Since Sandra was handling the financial transactions for the Debtor, her statement is direct evidence that the Debtor's payments to MCB were, as a matter of

fact, intended to be in exchange for the Debtor's use and occupancy of the sawmill real estate. The Trustee suggests no other interpretation of her testimony.

Sandra's testimony is corroborated by the fact that she did not cause the Debtor to begin paying MCB until the Debtor's use and operation of the sawmill actually commenced; by the fact that while it was paying MCB, the Debtor made no separate payments to the Newnams for rent; and by the fact that the checks she wrote from the Debtor's account to MCB contained a reference in the memo portion to "Lacon Lease." It is also worth noting that Sandra is not a defendant in this adversary proceeding. She has no apparent reason to fabricate her testimony and the Trustee makes no such accusation. In the Court's view, the evidence supports the conclusion that the Debtor's direct payments to MCB were intended to kill two birds with one stone, by satisfying the Newnams' mortgage obligation to MCB and the Debtor's rent obligation to the Newnams with one check.

In her response to MCB's motion for summary judgment, the Trustee makes the curious assertions that "there is nothing in the record to show the 10 mortgage payments to MCB were in lieu of paying rent to the Newnams" and, regardless of the evidence, that fact is "irrelevant." A constructive fraud claim under section 5 of the UFTA requires the plaintiff to prove that the debtor made the challenged transfer without receiving a reasonably equivalent value *in exchange for* the transfer. This statutory element contemplates proof of a *quid pro quo.* See, *e.g.*, *In re Richards & Conover Steel, Co.,* 267 B.R. 602, 612 (8th Cir. BAP 2001). Evidence of what a debtor gained or hoped to gain in return for making a challenged payment is relevant because it is a necessary element of proof. As previously set forth, Sandra's testimony that the Debtor's payments to MCB were in lieu of rent is part of the record, is not contradicted by any other evidence, and is corroborated by other circumstantial evidence. As the person making the

9

financial decisions on behalf of the Debtor, Sandra was in the best position to know why the Debtor's payments to MCB were being made, that is, to know whether there was a *quid pro quo* and what it was.

The Trustee relies upon *In re Frank Santora Equipment Corp.,* 256 B.R. 354 (Bankr. E.D.N.Y. 2000), a case involving similar but readily distinguishable facts. The debtor was an eponymous corporation owned by Frank Santora, who owned the commercial real estate that the debtor occupied as its business premises under a written lease calling for annual rent of $120,000. Mr. Santora was personally obligated to National Westminster Bank for a loan secured by a mortgage on the same commercial real estate. The debtor was not an obligor on the mortgage loan. Between June 1991 and January 1992, the debtor paid eight of the mortgage payments from its business checking account. When the trustee sued National Westminster Bank to recover those payments under a theory of constructive fraud, the bank argued that the transfers were attributable to the monthly lease payments that the debtor owed to Mr. Santora, which the debtor was paying directly to the bank pursuant to a collateral assignment of the lease. Thoroughly reviewing the evidence on cross-motions for summary judgment, the court found that at the same time it was making the mortgage payments to the bank, the debtor was also making separate monthly rent payments to Mr. Santora. The court stated that the bank had not produced a scintilla of evidence that the payments it received were attributable to the debtor's lease with Mr. Santora. The court concluded that the transfers were made by the debtor to satisfy Mr. Santora's personal obligation under the mortgage without the debtor receiving any consideration or value in exchange for those payments.

The evidence before this Court is materially different and leads to the contrary conclusion. As previously summarized, all of the evidence in the record, both direct and

circumstantial evidence, supports the conclusion that the Debtor's payments to MCB were made in lieu of a direct rent payment and in satisfaction of its obligation to pay rent to the Newnams. Sandra's unrebutted testimony is that the Debtor was not, at the same time, making separate rent payments to the Newnams. To borrow a phrase from the *Santora* court, the Trustee has not produced a scintilla of evidence that would contradict this finding. These material facts are not in dispute and the *Santora* case is distinguishable on this basis. Importantly, the *Santora* court engaged in the requisite *quid pro quo* analysis, determining, in effect, that since the debtor's payment of Mr. Santora's mortgage loan was not, as a matter of fact, in lieu of rent, the debtor did not receive the value of the use and occupancy of the commercial real estate *in exchange for* those payments.

  The Trustee's assertion that MCB's *quid pro quo* evidence is irrelevant is simply mistaken as a matter of law. Because all of the evidence in the record before the Court supports the same conclusion, the Court has no difficulty finding as a matter of fact that the Debtor was making the monthly payments to MCB as a substitute for remitting monthly rent payments to the Newnams. By paying MCB, the Debtor was providing consideration to the Newnams for its use and occupancy of the sawmill real estate. Again, the evidence permits no reasonable inference to the contrary. The *quid pro quo* is established: the Debtor's payments to MCB were made in exchange for the Debtor's use and occupancy of the sawmill real estate. This is a material fact about which there is no genuine dispute.

  Taking a different tack, the Trustee contends that no matter what Sandra's intent was with respect to the payments, during the period when there was no written lease between the Newnams and the Debtor, the payments could not have been "in lieu of rent" because the Debtor had no obligation to pay rent until the written lease was executed. During the period before the

11

written lease was executed, argues the Trustee, the Debtor was merely making payments on a third party's mortgage loan for which the Debtor had no liability, so that the payments were "unsupported by any consideration." Therefore, says the Trustee, the Debtor received "no value at all for these gratuitous payments," so that the question of reasonable equivalency is immaterial. MCB maintains that the "value" received by the Debtor was the use of the sawmill real estate.

The Trustee's initial premise that the Debtor had no obligation to pay rent is not correct as a matter of Illinois law. It is clear that a written lease is not necessary to create an obligation to pay rent. Parol leases are valid and enforceable except where the agreed term is longer than one year, in which event the term is unenforceable under the Statute of Frauds and the tenancy becomes month-to-month, but the tenant is still liable to pay the agreed upon amount of rent during the period of occupancy. *Marr v. Ray,* 151 Ill. 340, 344-45 (1894); *Delphi Industries, Inc. v. Stroh Brewery Co.,* 945 F.2d 215, 220 (7th Cir. 1991). Even if the entire lease is determined to be invalid or void, the tenant remains liable for the reasonable value of the occupancy for as long as he remains in possession. *South Austin Realty Assoc. v. Sombright,* 47 Ill.App.3d 89, 93 (Ill. App. 1 Dist. 1977).

Even if there was never a lease agreement at all, written or oral, compensation to the owner is nevertheless still due. By statute, a landowner is entitled to fair and reasonable compensation when the property is "held and occupied by any person without any special agreement for rent." 735 ILCS 5/9-201. When one party occupies the premises of another without any agreement for the payment of rent, the law implies a promise on the part of the occupant to pay the owner, for the use and occupation thereof, a reasonable rental value. *Klepak v. Scinto,* 2014 IL App (1st) 131912-U, ¶23. The occupant is liable to pay reasonable rent unless

12

his possession is under a claim of title or otherwise adverse to the owner, or where the owner agreed that he need not pay rent. *Oakes v. Oakes,* 16 Ill. 106 (1854); *Jackson v. Reeter,* 201 Ill.App. 29, 32 (Ill. App. 3 Dist. 1915).

The evidence establishes that the landlord-tenant arrangement initiated by Sandra was that the Debtor would have the possession and use of the sawmill real estate in exchange for which the Debtor, instead of making monthly rent payments to the Newnams, would make monthly payments direct to MCB in an amount sufficient to cover the mortgage payment that the Newnams owed MCB. This arrangement, which went into effect when the Debtor began operating the sawmill, although unwritten, constitutes an enforceable lease as a matter of Illinois law. The Debtor became liable to the Newnams to make the payments to MCB and, thus, those payments satisfied the Debtor's own liability to pay rent. Even if there hadn't been a valid lease agreement, the Debtor was liable for rent as a matter of Illinois law as discussed above. A debtor's payment in satisfaction of its own debt is expressly defined in the UFTA to be for value. 740 ILCS 160/4(a). A debtor's payment of its own debt constitutes a dollar-for-dollar satisfaction of a contractual debt, which is reasonably equivalent value. *Freeland v. Enodis Corp.,* 540 F.3d 721, 735 (7th Cir. 2008).

In support of her argument that the Debtor received no value, the Trustee heavily emphasizes the fact that the Debtor bore no liability to MCB on the note and mortgage signed by the Newnams. While that fact is conceded, this argument mistakenly assumes that "value" can be realized only through satisfaction of one's own contractual liability.

The general rule is that a debtor does not receive reasonably equivalent value by paying the debt of a third party. There are three recognized exceptions, however, to this rule. First, value may be recognized where the debtor and the third party are so related or situated that they share

13

an identity of interests because what benefits one will, in such case, benefit the other to some degree. *In re Pembroke Development Corp.,* 124 B.R. 398, 400 (Bankr. S.D. Fla. 1991). Second, even without an identity of interests with the obligor, value may be recognized where the debtor receives an indirect, but "fairly concrete," benefit from its payment. *In re Image Worldwide, Ltd.,* 139 F.3d 574, 578 (7th Cir. 1998). Third, value is recognized where the debtor, rather than the third party, receives the benefit of the original consideration. *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979, 991-92 (2d Cir. 1981)(courts recognize that a debtor may receive fair consideration even though the consideration given in exchange for his transfer goes initially to a third person, if the debtor ultimately receives the consideration; the transaction's benefit to the debtor need not be direct but may come indirectly through the third party).

The first two exceptions involve intangible benefits to a debtor in the sense that a related party, who previously incurred a debt for its own benefit, receives the benefit of having its debt paid by the debtor, which has the secondary effect of benefitting the debtor because of their relationship. Here, however, the right to possess and use the sawmill real estate is the original consideration provided to the Newnams by MCB which the Newnams transferred to the Debtor by lease, enabling the Debtor to enjoy the benefit of the use of the property. The tripartite nature of the transaction does not alter the economic reality that the Debtor received the tangible benefit of the mortgage loan transaction between MCB and the Newnams. Thus, the first two exceptions do not apply and it is not necessary to address the alternative arguments made by the parties about whether the Debtor received a secondary benefit because of the nature of its relationship with the Newnams.

It is the third exception that is applicable here, where the Debtor received the primary, tangible benefit of the right to occupy the premises. In *Matter of Evans Potato Co., Inc.,* 44 B.R.

14

191 (Bankr. S.D. Ohio 1984), relied upon by MCB, a critical vendor cut off the debtor's ability to purchase its goods on credit due to unfavorable credit reports. The debtor's landlord was able to purchase the needed goods on credit in his own name and provide them to the debtor for its use. The debtor issued certified checks from its account to the vendor in payment for the goods even though it had no contractual liability to the vendor. Conducting a constructive fraud analysis, the court held that because the goods were provided to and used by the debtor, it received reasonably equivalent value in exchange for its payments, notwithstanding that the debtor bypassed paying the landlord/purchaser by directly paying the vendor.

Other courts have recognized the same principle, that payment of a third party's debt may accord value to a debtor where the debtor receives the benefit of the original consideration. *In re Chicago, Missouri & Western Ry. Co.,* 124 B.R. 769, 773 (Bankr. N.D. Ill. 1991); *In re Laramie Assoc., Ltd.*, 1997 WL 67848 (Bankr. E.D. Pa.); *In re PSN USA, Inc.,* 2011 WL 4031147 (Bankr. S.D. Fla.), *aff'd*, 615 Fed. Appx. 925 (11th Cir. 2015).

Moreover, the tripartite nature of the transaction is no impediment to a determination that a debtor received actual value. See *In re Holly Hill Medical Center, Inc.,* 44 B.R. 253, 255 (Bankr. M.D. Fla. 1984). Neither is it necessary that the value received by the debtor be given to it by the party to whom it made payment, as in a two-party transaction. While the debtor's payment results in a dollar-for-dollar satisfaction of the third party's liability, the third exception recognizes that where the debtor receives the original consideration, it receives the primary economic benefit from the underlying loan or credit transaction. If the debtor receives actual value, it matters not from whom the value was received as long as the value was *in exchange for* the debtor's payment.

15

Arguments similar to the one made by the Trustee here, that because the Debtor was not indebted to MCB, it could not have received any value for its payments, have been rejected by other courts. In *In re Jeffrey Bigelow Design Group, Inc.,* 127 B.R. 580 (D. Md. 1991), aff'd, 956 F.2d 479 (4th Cir. 1992), where the district court affirmed a bankruptcy court judgment for constructive fraud, the debtor made interest payments on bank loans obtained by two individuals. The debtor bore no liability on the loans but the loan proceeds were disbursed to and used for the sole benefit of the debtor. On appeal, the trustee argued that because the debtor was not indebted to the bank, it did not receive any value for its payments to the bank. Framing the issue as whether, under the circumstances of this particular tripartite financial transaction, the debtor received any value at all, the district court reasoned as follows:

> "Other courts have concluded that the fact that value flowed to the debtor through a third party does not necessarily bar a finding that the debtor received reasonably equivalent value. (citations omitted). In each of these cases, a third party arranged or secured a loan for the benefit of the debtor. In each case, the court looked past the technical arrangement of the transaction and focused on whether the debtor received the *benefit* of the "value." If the debtor ultimately received the benefit or exclusive use of the "value," regardless of the technical financing arrangements, then the debtor had received "reasonably equivalent value" for the purpose of §548(a)(2)."

127 B.R. at 584. Because the loans were used for the debtor's benefit, the district court concluded that the bankruptcy court properly found the debtor had received reasonably equivalent value in exchange for the interest payments it made to the bank on loans made to third parties.

This Court agrees with the district court's reasoning. "Value" is not limited to a debtor's payment of its own debt. While satisfaction of one's own debt is sufficient to constitute "value," it is not exclusive, as that term is broader in scope. The value element may be met when a debtor pays another's debt in exchange for a benefit received by the debtor on account of that payment.

16

Document Page 17 of 18

By focusing solely on the benefit to the Newnams from the Debtor paying their mortgage payments, the Trustee overlooks the value realized by the Debtor. When the Newnams obtained a mortgage and purchased the sawmill real estate from MCB, they did so with the intent to use the property to operate a sawmill business. The Debtor entity was formed for that purpose and the real estate was essential to the Debtor's business operation. The right to occupy and use commercial real estate is a property interest that has inherent value, measurable by analyzing the market for such real estate. The Debtor's tenancy interest in the sawmill real estate is an interest in property that accorded actual and substantial value to the Debtor. The Court agrees with MCB that there is no serious argument to the contrary.

The Trustee also disputes that the Debtor received any real value since, given its thinly capitalized financial structure and ultimate demise, the real estate was used by the Debtor in furtherance of a business venture that was doomed from the beginning. For purposes of a fraudulent transfer analysis, however, in assessing the "value" of property, goods or services provided to a debtor, the question is not whether the debtor subjectively benefitted from the property it received; the operative question is whether the property, goods or services had objective value. *In re Caribbean Fuels America, Inc.,* 688 Fed.Appx. 890, 894-95 (11th Cir. 2017); *In re Universal Clearing House,* 60 B.R. 985, 998-1000 (D. Utah 1986). See, also, *In re Ozark Restaurant Equipment Co., Inc.,* 850 F.2d 342, 344-45 (8th Cir. 1988)(since reasonably equivalent value is a means of determining if the debtor received a fair exchange in the market place, the inquiry presumes a hypothetical transaction by willing parties unconstrained by the particular financial circumstances of the debtor). So it makes no difference whether the Debtor was adequately capitalized or turning a profit. It makes no difference whether or not MCB would have foreclosed the mortgage if the Debtor hadn't made the payments. Under the UFTA, a

successful defense of a constructively fraudulent transfer claim requires only that a debtor received reasonably equivalent value in exchange for its transfers, with value determined on an objective, fair market basis. All of the evidence demonstrates that the Debtor did receive a necessary and objectively valuable interest in real property as a *quid pro quo* for its payments to MCB.

The only remaining issue is whether the fair rental value of the sawmill real estate is reasonably equivalent to the payments the Debtor made to MCB. The record contains no direct evidence of the fair rental value of the sawmill real estate. Under Illinois law, there is a rebuttable presumption that the fair rental value is the amount of rent fixed in the lease. *Brackett v. Sedlacek,* 116 Ill.App.3d 978, 983 (Ill. App. 1 Dist. 1983); *In re Schnabel,* 612 F.2d 315, 318 (7th Cir. 1980). Cf. *In re Garden Ridge Corp.*, 323 B.R. 136, 142 (Bankr. D.Del. 2005)(when debtor occupies and uses real estate, landlord is entitled to administrative expense claim equaling the fair rental value of the premises, which is presumed to be the contract rate). With no evidence offered by the Trustee to rebut the presumption, it must be determined that the $2,200 monthly payment paid by the Debtor to MCB was a fair rental value for the sawmill real estate. Therefore, the Debtor received reasonably equivalent value for its payments to MCB.

Having failed to establish a genuine issue of fact with respect to the reasonably equivalent value prong of the two-step constructive fraud analysis under section 5(a)(2) of the UFTA, the Trustee is checkmated. There is no need to consider the arguments of the parties with respect to the second prong. MCB is entitled to summary judgment.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###